890 F.2d 611
 David CLARK
v.
TOWNSHIP OF FALLS and James Kettler, individually and as
Chief of Police of the Township of Falls and Charles
Chimera, individually and as former Supervisor, Chairman of
the Board of the Township of Falls, and August Baur,
individually and as Township Manager of the Township of Falls.
Appeal of Charles CHIMERA.
David CLARK
v.
TOWNSHIP OF FALLS and James Kettler, individually and as
Chief of Police of the Township of Falls and Charles
Chimera, individually and as former Supervisor, Chairman of
the Board of the Township of Falls, and August Baur,
individually and as Township Manager of the Township of Falls.
Appeal of TOWNSHIP OF FALLS and James Kettler.
David CLARK, Appellee/Cross-Appellant,
v.
TOWNSHIP OF FALLS and James Kettler, individually and as
Chief of Police of the Township of Falls and Charles
Chimera, individually and as former Supervisor, Chairman of
the Board of the Township of Falls, and August Baur,
individually and as Township Manager of the Township of Falls.
 Nos. 89-1226, 89-1227, 89-1228.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 2, 1989.
Decided Nov. 22, 1989.
 
 Joseph M. Fioravanti, Edward T. Lawlor, Jr. (Argued), Curran, Winning & Fioravanti, P.C., Media, Pa., for appellant/cross-appellee, Charles Chimera.
 Kenneth L. Oliver, Jr. (Argued), Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for appellant/cross-appellee, Township of Falls.
 Thomas W. Jennings, Thomas H. Kohn (Argued), Sagot & Jennings, Philadelphia, Pa., for appellant/cross-appellee, James Kettler.
 Robert O. Baldi (Argued), Baldi & Cepparulo, P.C., New Hope, Pa., for appellee/cross-appellant, David Clark.
 Before GIBBONS, Chief Judge, and SLOVITER and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 
 1
 This appeal marks the latest skirmish in a regrettable and unseemly decade-long battle between appellee David Clark, on one hand, and one faction of supervisors and other officials in the Township of Falls, Pennsylvania, on the other hand. Over the years Clark, a lieutenant in the township police department, and appellants, the Township, Chief of Police James Kettler, and Charles Chimera, a former member of the Township's Board of Supervisors, have disagreed, often vehemently and vociferously, on the governance of the Township and of the police department and on Clark's role in the police department.
 
 
 2
 Clark brought this suit on May 3, 1988 under 42 U.S.C. Sec. 1983 contending that defendants had taken actions against him that violated his rights under the United States Constitution and state law. At the close of trial, the jury found that the Township and Chimera had violated Clark's First Amendment rights, that the Township had deprived Clark of a property interest in his employment, that the Township, Chimera, and Chief Kettler had deprived him of a liberty interest in his reputation, that all three had also deprived him of procedural due process, and that Chimera and Kettler had intentionally inflicted emotional distress upon him. The jury awarded Clark compensatory damages against the Township in the amount of $50,000 and against Kettler and Chimera in the amount of $10,000 each, and punitive damages against Kettler and Chimera in the amounts of $10,000 and $30,000 respectively.[1] At the close of Clark's case defendants moved for a directed verdict and, after the verdict was rendered, moved for judgment notwithstanding the verdict or, in the alternative, a new trial. The motions were denied. Defendants then filed a timely notice of appeal.
 
 
 3
 Defendants have raised myriad contentions on appeal. The most compelling is that the relevant evidence before the jury did not support the jury's findings of liability. In addition, Clark has brought a cross-appeal from the district court's orders denying his motions to amend his complaint.
 
 
 4
 In reviewing the jury's verdict we must consider the evidence adduced at trial in the light most favorable to Clark, as the verdict winner. See Hahn v. Atlantic Richfield Co., 625 F.2d 1095, 1099 (3d Cir.1980), cert. denied, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). However, for the purpose of determining whether there was evidence before the jury to support its findings, we can rely only on relevant evidence. In this connection, we note that Clark has not appealed the district court's ruling, made on defendants' pretrial motion for summary judgment, that the Pennsylvania two-year statute of limitations applicable to section 1983 claims barred Clark from basing his claims on acts that occurred prior to May 3, 1986.
 
 
 5
 The trial court did permit testimony concerning events prior to May 3, 1986 to be admitted into evidence in order to show context, motive, and pattern. In determining whether there was sufficient evidence to support the jury's verdict, however, we must focus on conduct that took place from May 3, 1986, the beginning of the applicable statute of limitations period.
 
 II.
 Factual Background
 
 6
 The Township of Falls is a second class Pennsylvania township governed by a five member Board of Supervisors. Daily business is handled by a township manager who is appointed by the Board. Chimera was a supervisor from January 1976 until December 1987. He was Chairman of the Board of Supervisors several times, the last being from January 1986 until December 1987. Traditionally, the Chairman of the Board of Supervisors often makes decisions and issues directions individually. Kettler is Chief of Police of the Township of Falls. He has held that position since 1978, except that he was suspended in August 1985, discharged in November 1985, and then reinstated by a state court in March 1986.
 
 
 7
 There was evidence at trial that in 1981 Clark filed a prior civil rights action against the Township and Kettler, that the action against the Township was dismissed but that in 1983 Clark received a jury award of compensatory and punitive damages against Kettler which the parties thereafter settled, that Chimera was furious, and that, unknown to Clark, Chimera threatened to get even with him.
 
 
 8
 According to Clark's testimony, after his first lawsuit he was subjected to a series of harassing actions and unjustified public intimations of wrongdoing and even accusations. For example, shortly after the settlement with Kettler, a document critical of Clark was distributed throughout the Township and there was testimony that Chimera oversaw production of the document. That document, captioned The Blue Code of Silence, charged that Clark engaged in various instances of police misconduct. Clark rebutted each charge point by point at trial.
 
 
 9
 In 1983, it was discovered that $2,500 was missing from police funds. As part of an investigation by an independent investigator, Clark was required to submit to a polygraph test in 1984. Subsequently, a newspaper article reported that all employees presently working at the Township had been cleared.
 
 
 10
 In the spring of 1985, Clark, who was then acting police chief because Kettler was away, compiled a list of police equipment and supplies needed by the police department which was submitted to the Supervisors with the approval of Chief Kettler. Thereafter, Clark was investigated by the District Attorney. He was also required to appear before a grand jury in the summer or fall of 1985 because some of the equipment ordered consisted of a parabolic microphone and another secret listening device which may have been illegal. At the direction of his attorney who believed Clark was being set up, Clark pleaded the Fifth Amendment before the grand jury; thereafter numerous articles appeared in the newspapers reporting his use of the Fifth Amendment.
 
 
 11
 In December 1985, Clark was called to a meeting of the Board and as he entered Chimera "gave [him] the Nazi salute and yelled Seig Heil like the Nazi storm troopers." App. at 217. Clark immediately left the meeting.
 
 
 12
 In January 1986, after two candidates for supervisor allied with Chimera were elected to the Board, Chimera moved to demote Clark and several other police officers. When another supervisor accused Chimera of maintaining a "hit list", Chimera retorted that he had a hit list and that he would show how it could be used. At its February meeting, the Board voted to demote the officers Chimera had suggested, except that Clark was not demoted after another supervisor warned the Board they might be sued by Clark again.
 
 
 13
 In the summer of 1986, the Bucks County District Attorney, at the request of the two new supervisors aligned with Chimera, convened a grand jury to investigate whether anonymous campaign literature disparaging the two supervisors had been distributed in violation of state law during their election campaign in 1985. Clark, who was subpoenaed, told the grand jury that allegations that he had helped produce the literature with others at his home were patently false because he and his wife were separated at that time and he lived elsewhere.
 
 
 14
 Although Clark received a letter from the District Attorney "some months later saying [Clark] didn't do it," App. at 224, the issue emerged again in late 1987, when Officer Wayne Cloud gave a statement to Lieutenant John Rendeiro accusing Clark, inter alia, of having been involved in the production of illegal campaign literature. Rendeiro gave the statement to Chief Kettler, and Cloud's statement was sent to the District Attorney's office. The portion of the statement relating to campaign literature was anonymously placed in the office mailbox of Supervisor Gowton, who was allied with Chimera and who displayed the pages to the press and the public during the recess of a January 1988 township meeting.
 
 
 15
 At the same meeting, District Justice Vislosky stated that she believed that Clark was being investigated by the Township. The Board went into executive session and announced through the Township Solicitor that the matter had been referred to the District Attorney's office and that Clark was under an internal investigation. This was the first time Clark learned that he was under investigation. Both Vislosky's statements and Gowton's disclosures were reported in the local press.
 
 
 16
 In 1987, Clark informed Kettler that an officer reported that he was unable to get a timely preliminary hearing. Clark said he was going to call the District Attorney and Kettler gave him seven more cases with procedural deficiencies to refer. At Kettler's direction, Clark spoke with a reporter who, in Kettler's presence, stated that the Chief told him that there were "cases that ha[d] been mishandled or improperly handled by the District Justices." App. at 227. The subsequent news articles about this investigation angered District Justice Vislosky. Clark then decided on his own to review police department records to determine whether other cases had been improperly handled by police officers or district justices. He kept Kettler informed and ultimately concluded that about seven police officers were primarily responsible for the mishandled cases. In connection with his investigation, Clark had removed numerous files to his office.
 
 
 17
 In late 1987 or early 1988, the Board, in response to some allegations of destruction of records, placed control of all the police records in the office manager. Clark was required to surrender his key to the record room. At the January 1988 meeting, the Board voted that the material Clark had collected for his investigation be turned over to the Township Manager or another officer.
 
 
 18
 August Baur, who became Township Manager on January 11, 1988, suggested to Kettler that in view of the investigation which was to begin shortly into the mishandled court cases, Clark should be removed from the responsibility of being Lieutenant in charge of records. Baur turned over the files Clark had been investigating to Business Risks, Inc. (BRI), a private consulting firm, which the Township retained in early 1988 to investigate the charges swirling through the police department. Ultimately, BRI produced a report on its investigation. The investigation and report were to be confidential and copies of the report were not given to the public or to Clark. However, the report was leaked to the newspaper which then printed excerpts critical of Clark, which he had no opportunity to rebut.
 
 
 19
 Chief Kettler told Baur that once responsibility for records was taken away from Clark, he had much less work to do than the other lieutenant. On February 5, 1988, Kettler issued a memorandum temporarily reapportioning the work between Clark and Lieutenant Shaffner and assigning some of Clark's duties to a sergeant. Clark had previously had responsibility for records, detectives, training, internal investigations, the youth aide panel, the court officer, special services, and crossing guards, and Schaffner had been in charge of the patrol division. As part of the reapportionment, Clark was relieved of all responsibilities except for communications, crossing guards, and training, and he and Schaffner were to share equal responsibility for the patrol division.
 
 
 20
 On February 23, 1988, the local paper published a letter written by Clark's wife in which she described her husband's changed duties. The following day the paper reported that the department was subject to an outside investigation and that Clark had been "stripped" of his duties. The article quoted the township manager saying that Clark was deprived of authority for records and for detectives " 'to preserve the integrity of the investigation and really to protect Lt. Clark from any accusations that he manipulated the records or anything else like that.' " App. at 513. Clark was reinstated to his former duties on March 16, 1988, after he told Chief Kettler he had retained legal counsel.
 
 
 21
 In addition to his claims based on the events set forth above, Clark contends that actions by the defendants were designed to and did limit his right to participate at Board meetings. Following the meeting at which the demotions were voted, Clark and other officers frequently attended Board meetings, specifically raising questions about various Township expenditures and police department practices, including the demotions. At the meetings, which became unruly, Chimera and some of the police officers made insulting comments to each other. In April, Kettler told Clark that the supervisors were becoming upset about the officers' presence and comments at their meetings and that "if it didn't stop soon as to the problem, they would implement something and take action against" Clark. App. at 219-20. Supervisor Gowton testified that Chimera felt animosity against Clark due to Clark's political beliefs and that Chimera was "not crazy" about having police officers attend Township meetings.
 
 
 22
 On June 26, 1986, the Township issued the following written directive, referred to in the testimony as a gag order, limiting the right of township employees to speak at Board meetings:
 
 
 23
 1) Before speaking [at public meetings of any Township Board or Authority] the employee shall identify him/herself as a Township employee and the department in which he/she is employed.
 
 
 24
 2) When speaking, the employee will not disclose any confidential information that he/she has knowledge of because of his/her employment.
 
 
 25
 3) An employee may speak on any issue that is before the particular Board or Authority with the exception of issues that are related to or arise out of his/her employment. This prohibition does not apply, however, to discipline or tenure hearings....
 
 
 26
 4) When speaking, or otherwise participating at a public meeting, the employee will always comport him/herself in an orderly and courteous manner.
 
 
 27
 Violation of the rule was punishable with discipline "up to and including discharge." App. at 435.
 
 
 28
 Clark testified that he stopped attending meetings "around April," App. at 219, and that his colleagues commented on his failure to appear. He also testified that he stopped attending after the passage of the "gag order." App. at 220. Another witness testified that Clark "came on occasion until the gag order came out" and then "[h]e stopped coming. He became very reticent and quiet." App. at 151.
 
 
 29
 Two months after the issuance of the directive the then-Deputy Police Chief was disciplined for revealing information to the press. At approximately the same time, Clark spoke with Kettler who reiterated his warning that if Clark continued to anger the supervisors by attending and speaking out at meetings, he might be fired. Clark testified that the police officers then stopped going to the meetings.
 
 
 30
 Although there may have been other incidents referred to in the testimony, Clark's case before the jury was based, in essence, on the evidence set forth above. Our function, when faced with an appeal from a denial of a motion for a j.n.o.v. on the ground of insufficient evidence, "is to determine only whether there is evidence upon which the jury could properly return a verdict...." Kinnel v. Mid-Atlantic Mausoleums, Inc., 850 F.2d 958, 961-62 (3d Cir.1988). Thus, we should "affirm the judgment of the district court denying the motion[ ] unless the record is critically deficient of the minimum quantum of evidence from which a jury might reasonably afford relief." Id. at 961 (citations omitted).
 
 III.
 The Due Process Claim
 
 31
 The jury's finding that defendants' actions set forth above violated Clark's due process rights can be sustained only if there was a basis to find that Clark had a protected interest which triggered the requirements of procedural due process. Clark contended that he was deprived of both a property right and a liberty interest, and the jury found that the Township "deprived Clark of a property right by demoting" him and that all three appellees "improperly deprived [Clark] of a liberty interest in his reputation." Although the jury is the final arbiter of disputed facts, whether there is a protected interest sufficient to trigger constitutional protection is an issue of law over which our review is plenary. See Cohen v. Board of Trustees of Univ. of Medicine, 867 F.2d 1455, 1468 (3d Cir.1989) (in banc); Berlanti v. Bodman, 780 F.2d 296, 299 (3d Cir.1985).
 
 A.
 Property Interest
 
 32
 Clark's claim of a property interest is based on what he characterizes as his demotion, referring to the 1988 change in his duties. The Township argues that Clark had no "right" to be assigned to any particular duties, and thus that the change in his duties did not impinge any protected interest. Because property interests are created and defined by state law, see Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) ("Property interests ... are created and their dimensions are defined ... from an independent source such as state law...."); see also Logan v. Zimmerman Brush Co., 455 U.S. 422, 430, 102 S.Ct. 1148, 1154-55, 71 L.Ed.2d 265 (1982); Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978), we must examine the applicable Pennsylvania law to discern whether it grants Clark a legitimate claim of entitlement to the retention of his duties.
 
 
 33
 The rights of Pennsylvania police in their employment are found in the Pennsylvania Police Tenure Act, 53 Pa.Cons.Stat.Ann. Sec. 812 (Purdon 1974), which states:
 
 
 34
 No person employed as a regular full time police officer in any police department of any township of the second class ... shall be suspended, removed or reduced in rank except for the following reasons: [physical or mental disability; violation of any official duty; commission of a crime; inefficiency, neglect, intemperance, disobedience of orders, or conduct unbecoming an officer; intoxication while on duty.]
 
 
 35
 Id. (emphasis added).
 
 
 36
 Clark was not "reduced in rank" as such because even when his duties were changed, he remained a police lieutenant in the same grade and with the same pay. He argues, however, that he was constructively demoted, and that such action is as effective in triggering due process protection as would be a formal reduction in rank.
 
 
 37
 We have found no Pennsylvania case that interprets the Police Tenure Act in an analogous situation, nor is there any helpful legislative history. The Pennsylvania Commonwealth Court has held that the protections of the Act apply to a police chief whose employment ended after he refused to agree to use his own car for patrols, a newly imposed condition of employment. Gauden v. Borough of Roscoe, 79 Pa.Cmwlth. 589, 470 A.2d 191 (1984). The court rejected the Borough's argument that the chief had voluntarily resigned and instead treated the police chief's termination as if he had been "removed" within the meaning of the Act by a constructive dismissal. Gauden suggests that Pennsylvania would recognize a claim of constructive reduction in rank if the change in the officer's circumstances were in fact comparable to reduction in rank, notwithstanding the nomenclature used.
 
 
 38
 Actual reduction in rank is effected by a change in job title. When the officer's job title has not been altered, which is the case when a constructive reduction in rank is alleged, we must look to other traditional indicia of change in rank to determine whether the employee's rank constructively has been reduced. A change in pay is the most obvious. Other indicia may be the imposition of duties normally given to employees of a lower rank, substantially reduced responsibilities, termination of privileges of rank, and whether the changes or restrictions are temporary.
 
 
 39
 Applying these criteria, we conclude that there was insufficient evidence adduced at trial from which the jury could have found that the Township constructively demoted Clark. First, despite the changes in Clark's duties, he retained not only his lieutenant's rank but also his lieutenant's salary. Second, although many of Clark's duties were taken from him, he was not left without any job functions. He continued to be responsible for training, communications, and crossing guards, duties which were formerly assigned to him. Furthermore, he was given the additional responsibility of shared supervision of the patrol division.
 
 
 40
 Clark points to the loss of the "privileges" of having a key to the records room and a shared office as evidence of termination of his privileges of rank. However, the loss of those privileges was concomitant to the change in duties because the key was given only to the person responsible for records and the office was assigned only to the officer in charge of the detective unit. These charges are not sufficient indicia of reduced rank to support the jury's finding of a constructive reduction in rank.
 
 
 41
 Clark clearly did not like the changes in his duties. He testified that he was left with "reading only non-important police reports" and riding on the street, and that he had "no job left." App. at 238-39. However, the undisputed testimony of Clark's fellow lieutenant was that the duties Clark did have--shared supervision of patrol officers and control over communications, crossing guards, and training--were duties generally performed by lieutenants and were not demeaning.
 
 
 42
 Finally, the changes in Clark's duties were in effect for only six weeks. It may be that the assignment to less desirable duties would have been permanent had Clark not consulted a lawyer, but such hypothetical projections are not a substitute for evidence. The duration of the change in duties for the relatively short period of six weeks was patently consistent with a temporary reassignment pending completion of the investigation.
 
 
 43
 Thus, notwithstanding the genuine distress Clark felt at the changes in his duties, we predict that the Pennsylvania Supreme Court would not interpret the "reduced in rank" language of the Police Tenure Act to encompass a similar temporary reassignment of duties. Cf. Mosrie v. Barry, 718 F.2d 1151, 1156, 1157 (D.C.Cir.1983) (noting unpublished district court decision that transfer of Chief of Homicide Branch to significantly less desirable uniformed position with same salary and rank but with loss of privileges and promotion opportunity is not reduction in rank under District of Columbia law); Tremp v. Patten, 132 Conn. 120, 42 A.2d 834, 836, 837 (1945) (where officer retains rank and pay, transfer from detective to regular police work of lower "plane, grade & dignity" is not a reduction in rank under Connecticut law).
 
 
 44
 We do not suggest that a change in duties could never constitute constructive reduction in rank under the Police Tenure Act but only, that based on the evidence adduced in this case, Clark was not constructively demoted. We also note that a wide panoply of adverse employment actions may be the basis of employment discrimination suits under Title VII of the Civil Rights Act and 42 U.S.C. Sec. 1981. See, e.g., Levendos v. Stern Entertainment, Inc., 860 F.2d 1227 (3d Cir.1988) (constructive discharge). Here, however, our task is the more restrictive one of looking to state law to define the property interest at issue.
 
 
 45
 Because we believe that the Pennsylvania Supreme Court would find that Clark was not constructively reduced in rank, it follows as a matter of law that no property interest in his employment created by the Pennsylvania Police Tenure Act was infringed. Thus, we must turn to Clark's claim of a liberty interest if we are to sustain the jury's finding of a procedural due process violation.
 
 B.
 Liberty Interest in Reputation
 
 46
 Clark's contention and the jury's finding that he had a liberty interest in his reputation which served as the predicate for his due process claim must surmount the formidable barrier imposed by Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In that case, the United States Supreme Court held that reputation alone is not an interest protected by the Due Process Clause.[2] The Court announced that defamation is actionable under 42 U.S.C. Sec. 1983 only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution. Id. at 701-12, 96 S.Ct. at 1160-65.
 
 
 47
 In its analysis, the Court recognized that its prior cases may not have been uniform in their treatment of the subject but concluded that the weight of its earlier decisions "establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause...." Id. at 702, 96 S.Ct. at 1161. It noted, for example, that in Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), it had held violative of procedural due process a Wisconsin statute which forbid the sale of alcoholic beverages upon "posting" of the names of persons who were found to be dangerous to themselves or others as a result of excessive drinking. It explained that "the governmental action taken in that case deprived the individual of a right previously held under state law--the right to purchase or obtain liquor in common with the rest of the citizenry." Paul, 424 U.S. at 708, 96 S.Ct. at 1164. It was the alteration of legal status, combined with the injury resulting from the defamation, which justified the invocation of procedural safeguards. Id. at 708-09, 96 S.Ct. at 1164. The Paul court read its earlier opinion in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), which concerned the failure to rehire a college professor, to mean that defamation in the course of the termination of employment could be actionable under section 1983, although defamation where the employee retains his employment could not. Paul, 424 U.S. at 709-10, 96 S.Ct. at 1164-65.
 
 
 48
 We applied Paul to facts similar to those presented here in Sturm v. Clark, 835 F.2d 1009 (3d Cir.1987). Sturm, a lawyer whose practice consisted primarily of representing federal inmates, filed an action complaining that officials at Allenwood Federal Prison Camp imposed special restrictions on her, interrupted her meetings with clients, and notified her that due to her "disruptive and unprofessional behavior" she could visit only during specified times. Id. at 1010-11. Sturm alleged that "as a result of defendants' directives and their corresponding depiction of her as disruptive and unprofessional, prison inmates are unwilling to retain her as counsel." Id. at 1012. Relying on Paul and Mosrie v. Barry, 718 F.2d 1151 (D.C.Cir.1983), we held that financial harm resulting from the loss of clients "is insufficient to transform a reputation interest into a liberty interest." Sturm, 835 F.2d at 1013.
 
 
 49
 In this case, Clark has failed to show that defendants' defamatory remarks and actions were conjoined with the alteration or extinguishment of any interest created or protected by the Constitution or state law. As we held in the preceding section of this opinion, Clark had no property interest under state law in retaining the duties and privileges he had previously enjoyed as a lieutenant. Therefore, their loss could not constitute the alteration or extinguishment of any right or interest.[3]
 
 
 50
 Clark contends that the testimony that his future job prospects were significantly affected by defendants' continued investigations of him, disparaging allegations, and innuendos demonstrates that something more than merely his reputation was adversely affected. Indeed, a former township manager testified that towns "don't try to hire people with this kind of baggage." App. at 204. In addition, Clark testified that he had informally discussed the prospect of employment with an agent of the Federal Bureau of Investigation but that, after the 1985 incident in which he was accused of complicity in the purchase of allegedly illegal listening devices, the FBI was no longer interested in employing him. Our holding in Sturm that the loss of potential clients is not sufficient to transform a reputation interest into a liberty interest is governing here, particularly because there was no testimony that within the statute of limitations Clark had actually applied for another job and been rejected. The possible loss of future employment opportunities is patently insufficient to satisfy the requirement imposed by Paul that a liberty interest requires more than mere injury to reputation.
 
 
 51
 It follows that there was no evidence that Clark had a liberty interest in his reputation or property interest in his employment upon which to base the constitutional requirement of notice and hearing,[4] and the jury finding that defendants violated Clark's right to procedural due process cannot be sustained. The right to procedural due process does not exist in isolation. Hewitt v. Helms, 459 U.S. 460, 469-72, 103 S.Ct. 864, 870-71, 74 L.Ed.2d 675 (1983); Roth, 408 U.S. at 570-71, 92 S.Ct. at 2705-06. Because no liberty interest or property right was violated in this case, no right to procedural due process attached. Thus, the district court erred in failing to grant defendants' motion for a j.n.o.v. on Clark's due process claim.
 
 IV.
 First Amendment
 
 52
 Clark's other constitutional claim was grounded on the First Amendment. The jury, answering a special interrogatory, found that the Township and Chimera, but not Kettler, had violated Clark's First Amendment rights. Prior to trial, Clark's First Amendment claim appeared to be two-pronged: that the Township's directive limiting speech by employees at township meetings was unconstitutional on its face and, in the alternative, that even if the directive itself were constitutional, the directive, when viewed in conjunction with the actions of defendants, impermissibly chilled Clark's First Amendment rights. In his opening statement at trial, Clark's counsel again seemed to suggest that the directive was facially defective.
 
 
 53
 Defendants argue that at trial Clark's counsel waived the claim that the directive was facially unconstitutional. They base this claim on the colloquy that occurred with the court on their oral motion for a directed verdict raised after Clark had completed his case. In that colloquy, set forth in full in the margin, Clark's counsel stated the gag order directive "may be overly broad the way it is written" but that he was not contending that the directive was unconstitutional on its face. He clarified that his only contention was that the directive in conjunction with defendants' other actions violated Clark's constitutional rights.[5]
 
 
 54
 It is not apparent to us whether counsel's concession was made for strategic reasons or by mistake. There is certainly authority from which one could argue, on a properly developed record, that the directive forbidding employees to speak on issues related to their employment was unconstitutional on its face. See Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (speech of public employees on matters of public concern protected under First Amendment); Zamboni v. Stamler, 847 F.2d 73, 77 (3d Cir.) ("public employees' criticism of the internal operations of their places of public employment is a matter of public concern" and is, therefore, protected speech), cert. denied, --- U.S. ----, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988); Gasparinetti v. Kerr, 568 F.2d 311, 315-16 (3d Cir.1977) (regulation of speech of police officers must be narrowly tailored), cert. denied, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). However, in light of the colloquy, we agree with defendants that Clark's waiver of the claim precludes us from considering the facial invalidity of the gag order on appeal.
 
 
 55
 If Clark had not withdrawn his claim that the directive was facially overbroad, defendants would have had the opportunity to defend the directive by attempting to show in the course of their case that the directive was the least restrictive alternative available to achieve the government interest of preventing severe disruption of the township supervisors meetings. See Zamboni, 847 F.2d at 78-79; Gasparinetti, 568 F.2d at 315-17; see also Trotman v. Board of Trustees of Lincoln Univ., 635 F.2d 216, 229-30 (3d Cir.1980), cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981). In light of Clark's waiver midway through the trial and before defendants presented their case, defendants had no reason to put forward any evidence they might have had that the directive was justified under the applicable authorities.
 
 
 56
 Moreover, the charge to the jury did not include the claim of facial invalidity. Indeed, Clark's appeal brief does not defend the jury's verdict on that basis. Therefore, we need not decide whether Chimera's role as Chairman of the Board in the adoption and implementation during the statutory period of the arguably overbroad directive could provide the basis for imposing liability on him. Once Clark withdrew his claim based on the facial illegality of the directive, the adoption of the directive alone cannot be a basis for liability. We must limit our consideration of Clark's First Amendment claim to the contention that defendants' other actions, in themselves or in conjunction with the directive, violated Clark's First Amendment rights.
 
 
 57
 Clark explains his First Amendment claim as follows: "Simply put, plaintiff stopped attending the Supervisor meetings and became silent as to the defendants' conduct after he was threatened with the loss of his job if he did not keep quiet. His right to speak and associate with others was taken from him by the defendants' threats." Brief for Appellee/Cross Appellant at 24. The difficulty in sustaining the jury's verdict on Clark's First Amendment claim is that the record is devoid of any evidence of acts within the statute of limitations period by either the Township or Chimera that could reasonably be construed as a "threat" of retaliation for Clark's First Amendment activities.
 
 
 58
 It is true that Kettler warned Clark in the summer of 1986 that if he did not stop speaking at meetings the supervisors might fire him. It is unclear whether Kettler's warning was meant as a threat or as friendly advice. The jury's finding that Kettler did not violate Clark's First Amendment rights suggests that the jury accepted the more benign interpretation. More importantly, there is no evidence, not even circumstantial evidence, that Kettler was acting at the direction of the Township or Chimera, the two defendants on whom liability was imposed on this count.[6] The testimony that Chimera disliked Clark's political views and was "not crazy" about having police at meetings is not sufficient to raise an inference that Chimera or someone authorized to act on behalf of the Township directed Kettler to warn Clark away from meetings.[7] See Hahn v. Atlantic Richfield Co., 625 F.2d 1095, 1099 (3d Cir.1980) (j.n.o.v. required when proof of essential fact so deficient that jury could only have ventured guess about its occurrence), cert. denied, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981).
 
 
 59
 There is, in short, a complete absence of relevant evidence, i.e., acts by either the Township or Chimera within the statute of limitations period, that could support the jury's finding that these defendants violated Clark's First Amendment rights. Again, we are obliged to conclude that the district court should have granted defendants' motion for a j.n.o.v. on this count.
 
 V.
 
 60
 Intentional Infliction of Emotional Distress
 
 
 61
 The remaining basis on which Clark may sustain the jury verdict against Kettler and Chimera is the jury's finding that they intentionally inflicted on Clark emotional distress. The parameters of the Pennsylvania tort of intentional infliction of emotional distress have been considered by this court in a number of cases. See, e.g., Bougher v. University of Pittsburgh, 882 F.2d 74, 80 (3d Cir.1989); Williams v. Guzzardi, 875 F.2d 46, 50-52 (3d Cir.1989); Cox v. Keystone Carbon Co., 861 F.2d 390, 394-96 (3d Cir.1988); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 85-87 (3d Cir.1987); Bradshaw v. GM Corp., 805 F.2d 110, 113-15 (3d Cir.1986); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273-75 (3d Cir.1979) (in banc). In Chuy, we predicted that the Pennsylvania Supreme Court would adopt the "evolving tort" of intentional infliction of emotional distress as articulated by section 46 of the Restatement (Second) of Torts (1965).[8] Chuy, 595 F.2d at 1273. In fact, the Pennsylvania lower courts have held intentional infliction of emotional distress to be a tort under Pennsylvania law. See, e.g., Rinehimer v. Luzerne County Community College, 372 Pa.Super. 480, 494, 539 A.2d 1298, 1305 (1988), and cases cited therein.
 
 
 62
 Recently, however, the Pennsylvania Supreme Court in Kazatsky v. King David Memorial Park, Inc., 515 Pa. 183, 185, 527 A.2d 988, 988 (1987), stated that it "has never had occasion to specifically adopt section 46 as the law in Pennsylvania." (footnote omitted). In light of its holding that the evidence in that case did not establish a right of recovery under the Restatement provision, it "left to another day the question of the viability of section 46 in Pennsylvania." 515 Pa. at 185, 527 A.2d at 989. Thereafter, in Guzzardi, 875 F.2d at 50-52, we were faced with the argument that Chuy incorrectly predicted Pennsylvania law. After analysis of the Kazatsky opinion, we concluded that,
 
 
 63
 [g]iven Kazatsky's express reservation of the viability of Sec. 46 and the court's specification of the evidence necessary to prove that kind of injury, we are unable to say that Pennsylvania will not impose liability for intentional infliction of emotional distress. See id. at 198, 527 A.2d at 995 (Larsen, J., concurring) (to measure conduct against standards of Sec. 46 and to establish type of evidence needed to prove injury under Sec. 46 is to adopt that section).... Absent a clearer statement from Pennsylvania's highest court, we remain bound by Chuy.
 
 
 64
 Guzzardi, 875 F.2d at 51. Accordingly, we continue to look to Pennsylvania cases and cases applying Pennsylvania law to determine what constitutes the intentional infliction of emotional distress.
 
 
 65
 The Court in Kazatsky stressed that "[t]he gravamen of the tort ... is outrageous conduct on the part of the tortfeasor." 515 Pa. at 190, 527 A.2d at 991. We have noted that in applying the "extreme or outrageous" language of section 46, the Pennsylvania courts have been "chary to declare conduct 'outrageous' so as to permit recovery...." Cox, 861 F.2d at 395; see Jones v. Nissenbaum, Rudolph & Seidner, 244 Pa.Super. 377, 383, 368 A.2d 770, 773 (1976) (quoting Restatement (Second) of Torts Sec. 46 comment d (1965)) (Conduct must "go beyond all possible bounds of decency, and ... be regarded as atrocious, and utterly intolerable in a civilized community.").
 
 
 66
 We have previously stated that it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Cox, 861 F.2d at 395. In a series of cases, federal courts applying Pennsylvania law have held that conduct complained about by an employee was not sufficiently outrageous to constitute intentional infliction of emotional distress. See Madreperla v. Williard Co., 606 F.Supp. 874, 880 (E.D.Pa.1985) (premeditated plan to harass an employee into resigning); Cautilli v. GAF Corp., 531 F.Supp. 71, 74 (E.D.Pa.1982) (tricking an employee into foregoing other employment); Cox, 861 F.2d at 394-96 (firing an employee the day he returned to work from a leave of absence during which he had triple bypass surgery).
 
 
 67
 Under Pennsylvania law, courts have found intentional infliction of emotional distress only where the conduct at issue has been "atrocious" and "utterly intolerable in a civilized community." Restatement (Second) of Torts Sec. 46, comment d (cited in Banyas v. Lower Bucks Hospital, 293 Pa.Super. 122, 437 A.2d 1236 (1981)). They have recognized that tort, for example, where hospital employees gave false reports so that plaintiff was indicted for homicide, see Banyas, 293 Pa.Super. 122, 437 A.2d 1236, where the defendant sexually harassed his employee and also forbid her from speaking with others, followed her at work, and withheld necessary information from her, see Bowersox v. P.H. Glatfelter Co., 677 F.Supp. 307, 311 (M.D.Pa.1988), and where the defendant's car hit a child, defendant buried him on the side of the road, and the parents discovered the body only months afterwards, see Papieves v. Kelly, 437 Pa. 373, 263 A.2d 118 (1970).
 
 
 68
 The actions of Chimera and Kettler within the statute of limitations period consist of forwarding charges to the district attorney, confirming that Clark was being investigated, showing disparaging reports in public, changing his duties and depriving him of privileges, and, possibly, limiting his speech at Board meetings. These acts, while deplorable, do not constitute extreme and outrageous conduct as Pennsylvania has defined those terms.
 
 
 69
 As this court stated in Powell v. J.T. Posey Co., 766 F.2d 131, 133 (3d Cir.1985), "[i]n reviewing the district court's denial of the defendant's motion for judgment notwithstanding the verdict, our standard of review is whether there was evidence presented at trial upon which the jury could properly return a verdict for the plaintiff." Once again, we must hold that the district court erred in failing to grant a j.n.o.v. on the claim of intentional infliction of emotional distress.[9]
 
 VI.
 Cross-Appeal
 
 70
 Clark has cross-appealed from the district court's order denying his "Motion To Amend Pleadings," to include events that occurred after the filing of the complaint, in particular defendants' leak of a portion of the BRI report critical of Clark to a local paper and defendant Baur's comments to the paper about the report. Clark filed his motion to amend on October 21, 1988, one week after the close of discovery and only three weeks before the scheduled trial. The events complained of occurred in June and July of 1988 and Clark did not explain why he had delayed filing the motion until October. Defendants told the court that additional discovery would be necessary if the motion were granted. Taking these circumstances into consideration, the trial court concluded that granting the motion would unduly prejudice defendants, but did permit Clark to introduce at the trial evidence concerning these events.
 
 
 71
 After trial, defendants moved for a new trial. In response, Clark moved pursuant to Fed.R.Civ.P. 15(b) to amend the pleadings to conform to the evidence, a motion the district court denied. We cannot see how Clark was adversely affected by the court's rulings because Clark was permitted to introduce the evidence at trial. In addition, in our merits determination we have considered the incidents Clark sought to include in his pleadings, but nonetheless have concluded that Clark's evidence was "critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir.1969). In any event, given Clark's delay in filing the motion to amend, the district court acted within its discretion in denying the motions.
 
 VII.
 Conclusion
 
 72
 We have held that the temporary change in Clark's duties did not constitute a reduction in rank within the meaning of the Pennsylvania Police Tenure Act and that, therefore, as a matter of law, the Township did not abridge any property right of Clark's. We have also held that in view of the legal principle that an injury to reputation will not sustain a claim of deprivation of a liberty interest, the absence of evidence of other cognizable injury requires us to conclude, as a matter of law, that defendants did not deprive Clark of a liberty interest. It follows that although Clark was not given notice and an opportunity to respond to the change in his duties or to the allegations and insinuations hurled at him and could not formally defend himself before the police department, the district attorney or the public, he was deprived of no interest which was entitled to procedural due process safeguards.
 
 
 73
 We have also held that in light of Clark's failure to preserve any claim that his First Amendment rights were infringed by the promulgation of the Township's directive alone, there was no evidence of additional acts committed by defendants during the period of the statute of limitations upon which to sustain the jury's finding that defendants Chimera and the Township violated Clark's First Amendment rights. Finally, we have concluded that the evidence was simply insufficient under Pennsylvania law to support a finding of intentional infliction of emotional distress by Chimera and Kettler.
 
 
 74
 It does not follow, however, that our reversal of the verdict for Clark can be viewed in any way as a vindication of defendants' conduct. On the contrary, given the jury's credibility determinations made in favor of Clark, there is ample evidence that defendants engaged in an unseemly and unjustifiable campaign of harassment against Clark. We are nonetheless obliged to conclude that their campaign, however reprehensible, did not rise to the level of a constitutional violation or a tort under Pennsylvania law.
 
 
 75
 Ordinarily, costs on appeal would be assessed against the losing party, who in this case is Clark. See Fed.R.App.P. 39(a). This court, however, retains discretion to alter the usual rule in an appropriate case. See, e.g., Powell, 766 F.2d at 135; see also 9 Moore's Federal Practice p 239.02 (2d ed. 1985); 16 C. Wright & A. Miller, Federal Practice and Procedure Sec. 3985 (1977) (equitable considerations may influence court to deny costs). We believe this is an appropriate case. Accordingly, notwithstanding the conclusion that we have reached, we will direct that each party shall bear its or his own costs.
 
 
 76
 For the reasons set forth above, the judgment of the district court will be reversed and the case remanded to the district court with a direction to enter an order granting defendants' motions for judgment notwithstanding the verdict.
 
 
 
 [1]
 A fourth defendant, Township Manager August Baur, was not found liable on any claim
 
 
 [2]
 Clark relies entirely on Owen v. City of Independence, Mo., 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), which is inapposite. Although the facts in that case were somewhat similar, in that the city council voted to disclose an internal investigation of the police chief to the media, the only issue before the Court was the qualified immunity of cities. The Court did not address the merits of the constitutional claim
 
 
 [3]
 Because we held that Clark was not constructively demoted or reduced in rank, we express no opinion whether constructive demotion or reduction in rank is the alteration of a legal right sufficient, when coupled with a harm to reputation, to create a liberty interest
 
 
 [4]
 Clark stresses that the Township had an ongoing recognized practice and procedure of affording a police officer an opportunity to respond to an internal investigation such as those to which he was subjected. A property interest is no more created by the mere fact that a state has established a procedural structure than is a liberty interest. See Hewitt v. Helms, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); Olim v. Wakinekona, 461 U.S. 238, 250-51, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983)
 
 
 [5]
 The colloquy in its entirety is as follows:
 Mr. Baldi: ... I think that a first amendment right claim has clearly been brought out and made reference to both by this witness and is supported by--
 The Court: How does it have to be supported?
 Mr. Baldi: He testified No. 1 when the people started to speak out against the demotions, including himself, a written order was issued which was P-6. Then the Chief of Police also said to him: You keep going out and talking you are going to be demoted or fired. It was within that context--
 The Court: How does P-6 [the directive] in and of itself--
 Mr. Baldi: I think in and of itself it may be overly broad the way it is written, but I think it can be argued that P-6 in and of itself would not be a violation. I think if you couple it with everything else that was going on at the time--
 The Court: You are not contending that P-6 itself would abrogate his first amendment rights?
 Mr. Baldi: I don't believe so, no. I think it has to be coupled with--
 The Court: These are issues in the case and unless we eliminate them we have to deal with them. This is a matter that the Court has to deal with, as opposed to the Jury.
 Mr. Baldi: I appreciate that. I think within the context of what has been heard I think he has been told repeatedly to quit spouting off, and he testified he stopped spouting off; in fact, he went South because of the threats he was getting. He also made reference to being called a Nazi, etc. at Township meetings. It doesn't take long to figure out that you better not show up there, that you are going to have the supervisors down on your head.
 (Tr. Day 5 at 114-15) (emphasis added).
 
 
 [6]
 Clark does not argue that Kettler's actions were those of a policy-maker and that the Township would thus be liable for his actions
 
 
 [7]
 Clark argues that even if Chimera did not act within the statute of limitations, Pennsylvania law on conspiracy permits liability on the basis of events occurring outside the statute of limitations. Clark urges us to look at earlier events such as Chimera greeting Clark with a Nazi salute. We need not decide the validity of Clark's interpretation of Pennsylvania law because there was no evidence of conspiracy at trial and no argument to the jury that conspiracy existed. Although the testimony at trial did include much discussion of the various political factions in the Township of Falls, Clark never contended that the "pro-Chimera faction" constituted a conspiracy with the shared objective of harming or silencing him
 
 
 [8]
 Section 46 of the Restatement provides:
 One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress....
 
 
 [9]
 In light of our disposition of this appeal, all of the defendants' other contentions challenging the trial court's rulings are moot