**Cheryl J. STURM, Appellant**

v.

**CLARK, J.J., Supt. FPC, Allenwood; Mathis, Earlando, Corr. Officer; Garzarelli, Louis, Sup. Corr. Officer, Owczarski, Ann, Personnel Officer; Chalmers, Mr., Corr. Officer, Myhand, Lieutenant, Sup. Corr. Officer, Isenberg, Mr., Corr. Officer, Campana, Mr., Corr. Officer, and Does, John, Unknown Correctional Staff, FPC, Allenwood, both individually and in their official capacities.**

No. 87–5170.

United States Court of Appeals,
Third Circuit.

Argued Sept. 28, 1987.
Decided Dec. 14, 1987.

James J. West, U.S. Atty., Wayne P. Samuelson, Asst. U.S. Atty. (argued), Lewisburg, Pa., for appellees.

Cheryl J. Sturm (argued), Wayne, Pa., pro se.

Before SEITZ, GREENBERG, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Unlike the more common appeal in which we consider the constitutionality of prison regulations designed to control the activities of inmates, the present inquiry requires us to review directives intended to restrain the conduct of an attorney practicing in a federal correctional institution. From November 1985 to June 1986, the appellee-defendant, Allenwood Federal Prison Camp (Allenwood or Camp), instituted a series of directives applicable only to the appellant-plaintiff, Cheryl J. Sturm, that effectively modified the terms and conditions of her access to the Camp.

Sturm thereafter filed a complaint in the United States District Court for the Middle District of Pennsylvania, alleging that the directives violated her federal constitutional rights, and her right to be free from undue interference with contract under Pennsylvania law. The district court dismissed plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(6). We affirm in part and reverse in part.

### I.

Sturm is a duly admitted attorney whose offices are in Wayne, Pennsylvania, and whose practice consists in large part of representing inmates at federal prisons on matters related to sentencing, resentencing, and parole. Plaintiff's complaint alleges a series of limitations imposed on her practice at Allenwood, a minimum security facility located in central Pennsylvania. On November 30, 1985, plaintiff visited the Camp to conduct a client interview. When Sturm began to speak to the wife of another client, officer Chalmers informed her that she could speak only to those inmates for whom she had a visitation permit.

Upon plaintiff's arrival at Allenwood the next day, officer Campana searched her briefcase and read confidential attorney-client correspondence. Campana additionally compelled Sturm to conduct her interviews under visual and audio surveillance of prison officers, and again precluded her from speaking to visitors and inmates for whom she did not have a visiting permit.[1] When Sturm objected, officer Isenberg replied that Allenwood would not tolerate "business solicitation" during its visiting hours. On Father's Day, June 15, 1986, while Sturm was conferring with a client, Lieutenant Garzarelli, also a prison officer, terminated the conference by informing the inmate that he could have his legal visit or his family visit but not both. On June 16, 1986, Superintendent Clark had the plaintiff presented with a letter giving notice

---

1. Shortly after December 1, Allenwood instituted a private visiting room to conduct attorney-client conferences.

that as a result of her "disruptive and unprofessional behavior" on June 15, her subsequent visits could occur only upon twenty-four hours notice, and between the hours of 8:00 A.M. and 3:30 P.M., Monday through Friday. Allenwood's restrictions on plaintiff's speech and access applied to no other attorney.[2]

On July 17, 1986, Sturm instituted a *Bivens* action against the defendants in their official and individual capacities seeking damages and an injunction for deprivation of her constitutional rights.[3] The district court granted defendants' motion to dismiss the complaint by memorandum and order dated February 20, 1987, holding that Sturm had failed to state a cause of action under the first, fifth, ninth, and fourteenth amendments of the constitution and under Pennsylvania tort law. At oral argument before this court, plaintiff conceded that the visiting hour directives contained in the June 16 correspondence had been lifted.[4] Therefore, Sturm's request for an injunction with respect to those directives is moot. Her claim for injunctive relief from speech restrictions is, however, still before us, as are her claims for compensatory and punitive damages.

## II.

In reviewing a motion to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party. *Wisniewski v. Johns Manville Corp.*, 759 F.2d 271, 273 (3d Cir.1985); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 685 (3d Cir.1980).

## A.

We first determine whether plaintiff's claim that the directives[5] embodied in the June 16 correspondence adversely affected her reputation without affording her due process of law within the meaning of the fifth amendment. In *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the Supreme Court examined the constitutionality of a Wisconsin statute that permitted the City of Hartford to post in all retail liquor stores, the names of individuals who by excessive drinking, endangered themselves, their families, or their communities. *Id.* at 434, 91 S.Ct. at 508. The statute prohibited the sale of alcoholic beverages to those whose names were posted. In holding that the statute violated the fourteenth amendment's due process clause, the Court asserted that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* at 437, 91 S.Ct. at 510. It added that whenever "a State attaches a 'badge of infamy' to the citizen, due process comes into play." *Id.* quoting *Wieman v. Updegraff*, 344 U.S. 183, 191, 73 S.Ct. 215, 218–19, 97 L.Ed. 216 (1952).

2. Generally, attorneys may visit Allenwood without notice and from 5:00 P.M. to 8:30 P.M. on Monday, Thursday, and Friday evenings, and from 8:30 A.M. to 3:30 P.M. on Saturday and Sunday.

3. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1970). Although *Bivens* created a cause of action for damages resulting only from a deprivation of fourth amendment rights, subsequent decisions extended the holding to the due process and equal protection clauses. *See Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

4. Neither party stated whether Sturm was still precluded from conversing with visitors and inmates for whom she had no visitation permit.

5. The directives at issue apparently constitute an exercise of the warden's authority under 28 C.F.R. §§ 543.13 and 543.14. The sections generally empower a warden to establish the terms and conditions of attorney visitation privileges, and to restrict those privileges should an attorney threaten institution security. Appellant's complaint, however, does not challenge 28 C.F.R. §§ 543.13 and 14 either facially or as applied. We therefore consider only whether the selective imposition of the directives violates the federal constitution. Additionally, any issue of failure to exhaust administrative remedies may be a matter for the district court's consideration on remand.

In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Court again examined the nexus between reputation and the due process clause, this time in the context of a university professor denied reappointment after the expiration of a one year contract. After observing that a constitution for a free people requires an expansive definition of liberty, the Court determined that the right to one's reputation is protected by the "liberty" component of the due process clause. 408 U.S. at 572–73, 92 S.Ct. at 2706–07. Although it ultimately denied respondent's entitlement to due process safeguards, the Court observed that the result would have been different had the State based its non-renewal decision "on a charge, for example, of dishonesty, or immorality." *Id.* at 573, 92 S.Ct. at 2707.

In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court reinterpreted its holdings in *Constantineau* and *Roth* in light of a due process challenge to a "flyer" distributed to Louisville merchants by the Kentucky Police Department containing the names and mugshots of "active shoplifters." *Id.* at 695, 96 S.Ct. at 1158. The respondent, who had been mistakenly included in the flyer, alleged a deprivation of liberty based upon impairment of his reputation and his future employment opportunities. *Id.* at 697, 96 S.Ct. at 1159. In rejecting the respondent's contention, the Court asserted that reputation cannot be accorded independent constitutional significance based, in part, on the fourteenth amendment's failure to make any explicit reference to it. *Id.* at 698, 96 S.Ct. at 1159. Therefore, it held that mere damage to reputation, apart from the impairment of some additional interest previously recognized under state law, is not cognizable under the due process clause. *Id.* at 711–12, 96 S.Ct. at 1165–66. Absent the alteration or extinguishment of a more tangible interest, inju-

ry to reputation is actionable only under state defamation law. *Id.* at 711–12, 96 S.Ct. at 1165–66. The Court additionally recognized that a state might elevate reputation to the status of a liberty interest by according it protection beyond that contained in its tort law. *Id.* at 710–12, 96 S.Ct. at 1165–66; *Mosrie v. Barry*, 718 F.2d 1151, 1159 (D.C.Cir.1983).

Returning to its prior precedents, the Court noted that "in each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished." *Id.* 424 U.S. at 711, 96 S.Ct. at 1165. Thus, due process safeguards attached in *Constantineau*, not because of any injury to reputation, but because the Wisconsin statute constituted a deprivation of a right previously recognized under state law—the right to purchase or obtain liquor. *Id.* at 708, 96 S.Ct. at 1164. Similarly, the Court reread *Roth* to require both damage to reputation and the extinguishment of government employment as a predicate for due process protection.[6] *Id.* at 709, 96 S.Ct. at 1164. Turning to the case before it, the Court held that because Kentucky did not extend any legal guarantee of present enjoyment of reputation apart from its tort law, the respondent's injury did not constitute a violation of the due process clause. *Id.* at 711–12, 96 S.Ct. at 1165–66.

Applying *Paul* to the present inquiry, we conclude that plaintiff fails to state a claim under the due process clause of the fifth amendment.[7] Sturm alleges that as a result of defendants' directives and their corresponding depiction of her as disruptive and unprofessional, prison inmates are unwilling to retain her as counsel. Plaintiff seeks to sanction the very result that *Paul* rejected, the constitutionalizing of the ordinary defamation action. *Mosrie*, 718 F.2d at 1158. Most, if not all, charges of defamation are inevitably accompanied by fi-

---

6. The Court explained *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), by noting that the stigma attached to Ohio's suspension of a student constituted a deprivation of liberty because *that state conferred a right upon all children to attend school.* 424 U.S. at 710, 96 S.Ct. at 1165.

7. We agree with the district court's conclusion that Sturm has not asserted a protected property interest within the meaning of the due process clause. *See Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

nancial loss. *Id.* at 1158. *Paul,* however, asserts that financial harm resulting from government defamation alone is insufficient to transform a reputation interest into a liberty interest. *See Mosrie,* 718 F.2d at 1151. Therefore, we must determine whether Sturm has alleged the alteration or extinguishment of some additional interest. *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160–61. Because the instant action arises under the fifth amendment, our search is predicated not upon state law, but upon interests created by the constitution or by federal law.

We observe that the Supreme Court has recognized the right of an attorney to practice law. *See In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). We nonetheless hold that the directives imposed upon Sturm's access to Allenwood do not constitute an extinguishment or significant alteration of the right to practice law. Plaintiff was not precluded from representing inmates at Allenwood but was required only to conduct her visits at designated times and upon twenty-four hours notice. As a result of the directives, Sturm actually had more visitation time than any other attorney at Allenwood,[8] although not the same hours of access. Additionally, plaintiff has asserted no federal statute, nor are we aware of one, that creates an independent right of action for damage to reputation.[9] *See Mosrie,* 718 F.2d at 1159. Therefore, her reputation claim must be rejected.[10]

### B.

We next consider plaintiff's contention that defendants' restriction precluding

her from speaking to both visitors at Allenwood and to those inmates for whom she did not have a visitation permit violated the first amendment. Initially, we must determine the appropriate constitutional standard to apply to an attorney who asserts first amendment rights in a prison context. Two recent Supreme Court cases illuminate our inquiry but do not resolve it. In *O'Lone v. Estate of Shabazz,* —— U.S. ——, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court considered a first amendment challenge to a regulation that prevented inmates performing outdoor labor from returning to the prison until evening. —— U.S. at ——–——, 107 S.Ct. at 2402–2403. The regulation had the effect of forcing Muslim inmates to miss a weekly afternoon congregational service. The Court recognized that valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security, justified imposing restrictions on recognized constitutional rights. —— U.S. at ——–——, 107 S.Ct. at 2403–2404. *See also Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). To ensure that courts afford appropriate deference to prison officials, the Court held that prison regulations impinging on inmates' constitutional rights are valid if reasonably related to legitimate penological interests. *O'Lone,* —— U.S. at ——, 107 S.Ct. at 2404.

In *Turner v. Safley,* —— U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court

---

**8.** Other attorneys have access to Allenwood for twenty-four and one-half hours per week while Sturm's visitation privileges extended for thirty-seven and one-half hours per week.

**9.** We note that plaintiff might press the argument that her first and fourteenth amendment claims create the requisite "additional interest" deprivation contemplated by *Paul.* Because we consider these claims separately, we will not evaluate them under the due process clause.

**10.** We are bound to apply *Paul v. Davis,* although it appears to be at odds with prior precedent. *See* Monaghan, *Of Liberty and Property,* 62 Cornell L.Rev. 405 (1977). In essence, *Paul*

transforms a right once accorded independent constitutional significance into a mere byproduct of state law. In her concurrence in *Mosrie,* 718 F.2d at 1162, Judge Ginsburg cogently emphasized this point:

> Traditionally, the security of one's reputation has been recognized as a right without which "it is impossible to have the perfect enjoyment of any other advantage or right." To banish the interest in a person's good name from the concept of liberty sheltered by due process stands wholly at odds with our ethical, political, and constitutional assumption about the worth of each individual.

*Id.* at 1163 (citing Monahagan, 62 Cornell L.Rev. at 426–27).

identified several factors relevant to determining the reasonableness of a prison regulation. First, there must be a valid rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. —— U.S. at ——, 107 S.Ct. at 2261. A second factor is whether alternative means of exercising the right remain open to inmates. *Id.* Finally, a court must consider "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.*

Although *O'Lone* and *Turner* applied the reasonable relation standard only to inmates, we nonetheless must consider whether the rationale of those cases should apply to activities of a duly admitted attorney within the confines of a prison. We note that a penal institution's interest in maintaining security is inevitably implicated by its decision to permit practicing attorneys to confer with clients on its facilities. The reasonable relation test, however, has been applied to modify only the constitutional rights of prisoners.

In *Procunier v. Martinez*, 416 U.S. at 413–14, 94 S.Ct. at 1811–12, the Court applied a demanding standard of review to determine whether a prison mail censorship regulation impaired the first amendment rights of non-inmates.[11] Recognizing that the regulation implicated the rights of free citizens, the Court evaluated the censorship restriction in light of cases dealing "with the general problem of incidental restrictions on first amendment liberties imposed in furtherance of legitimate governmental activities." *Id.* at 409, 94 S.Ct. at 1809. It explicitly reserved the question of the proper standard of review to apply in cases "involving questions of prisoners' rights." *See Turner,* —— U.S. at ——, 107 S.Ct. at 2260. We believe that the limitations expressed in *O'Lone* and *Turner* are useful in recognizing the essential differences between inmates and practicing attorneys.

The very fact of prisoners' incarceration necessarily implies that they pose a risk, and more often, a danger to society. Although attorneys may at times present their own peculiar risks, they ordinarily do not implicate a prison's interest in deterring crime, in encouraging rehabilitation, or in insuring institutional security. Although plaintiff's claim is made in the context of a penal ambience, we must evaluate it in light of conventional first amendment doctrine, and not in light of the less demanding standard involving only prisoners' rights.

■ In *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court identified three categories of public fora, distinguishable by the extent to which each constrains the government's ability to impose restrictions on free speech. *Id.* at 45–46, 103 S.Ct. at 954–55. The first category encompasses areas traditionally designated for public use. In public fora such as streets and parks, the government may not enforce content based exclusions without demonstrating that they are necessary to serve a compelling governmental interest, and that they are narrowly drawn to achieve that end. *Id.* at 45, 103 S.Ct. at 954–55. A second category consists of property that the government has opened for use by the public as a place for expressive activity. *Id.* Although the government is not required to open the forum, once it has done so it is bound by the same standards that apply to traditional areas. *Id. See also Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university meeting facilities); *Madison Joint School District v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meeting). The final category consists of public property that is not by tradition or designation a forum for public communication, such as school mail facili-

---

**11.** The Court asserted that first, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. 416 U.S. at 413, 94 S.Ct. at 1811. Second, "the limitation of first amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.*

ties. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. "In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the Speaker's view." *Id.*

Thus, we agree with the district court's conclusion that Allenwood falls into the third category of public fora, but we are constrained to reject its holding that the restriction directed specifically to Sturm constituted a permissible time, place and manner restriction. "[T]ime, place, and manner restrictions are reasonable if they are imposed 'without reference to the content of the regulated speech, ... serve a significant governmental interest, and ... leave open ample alternative channels for communication.'" *Pennsylvania Alliance for Jobs and Energy v. Council of Munhall,* 743 F.2d 182, 185 (3d Cir.1984) (quoting *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)).

The district court concluded that the directive was content neutral because "plaintiff has not alleged the restrictions were placed on her because of what she said or because the prison officials opposed her views." This conclusion, however, is at odds with the allegations contained in the complaint.[12] Sturm specifically alleges that the directive was imposed in retribution for Allenwood's false charge that Sturm "wandered around the visiting room soliciting business." Her allegation is substantiated by officer Campana's stated justification for the restriction, that Allenwood would not tolerate business solicitation in its facilities. Moreover, plaintiff asserts that Allenwood's restriction resulted from her criticism of officer Chalmers' attempt to prohibit visitors from entering Allenwood on weekends until after 11:00 A.M., although the designated visiting hours commenced at 10:00 A.M. Thus, taking plaintiff's allegations as true, we conclude that although the restriction was neutral on its face, it actually embodies a latent content bias.

Finally, we note that any possibility of the restriction's neutrality is undermined by the allegation, which we must assume as true, that Allenwood applied it *only* to plaintiff. Allenwood could have imposed a blanket prohibition on non-attorney-client communications, but instead, it chose to apply the proscription to a *single* attorney. That fact leads ineluctably to the conclusion that the defendants sought to regulate the content of speech, not the manner in which it occurred.[13]

First amendment precedent requires that content based exclusions be evaluated un-

---

**12.** The plaintiff's complaint alleged:
Defendant Isenberg stated that correctional officer Chalmers and other officers could direct plaintiff ... with whom to speak, and further advised plaintiff that they were not going to permit her to solicit business from others in the visiting room area.... Defendant Chalmers' actions were intentional, malicious, punitive, retaliatory and intended to discourage plaintiff from pursuing freedom of speech secured by the First Amendment....

**13.** Sturm additionally alleges that officer Campana's opening of a confidential correspondence violated the attorney-client privilege. Numerous courts have addressed the propriety of opening inmate mail, not in the context of the attorney-client privilege, but under the rubric of the first amendment. *See Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). To maintain prison security and to check for contraband, prison officials may, pursuant to a uniform and evenly applied policy, open an inmate's incoming mail. *Wolff v. McDonnell,* 418 U.S. 539, 574–77, 94 S.Ct. 2963, 2983–85, 41 L.Ed.2d 935 (1974). The burden remains upon the prison officials to assert legitimate reasons for interfering with a prisoner's incoming mail. *Procunier v. Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811; *Parrish v. Johnson,* 800 F.2d 600 (6th Cir.1986). Several courts have held that mail relating to a prisoner's legal matters cannot be read, and may only be opened in the prisoner's presence. *Taylor v. Sterrett,* 532 F.2d 462, 477–78 (5th Cir.1976); *Bach v. Illinois,* 504 F.2d 1100, 1102 (7th Cir.1974) (per curiam).

On remand, the district court should permit Sturm to amend her complaint to allege the deprivation of her first amendment rights. The complaint simply fails to specify whose rights are at issue, Sturm's or those of her clients. Moreover, the court should consider whether Allenwood's practice violates the attorney-client privilege and, if necessary, whether Sturm has standing to assert the first amendment rights of inmates.

der a restrictive standard. Where the government imposes a content based restriction, it must demonstrate that it is "necessary to serve a compelling interest and that it is narrowly drawn to that end." *Widmar v. Vincent*, 454 U.S. at 270, 102 S.Ct. at 274. Thus, although the defendants might ultimately satisfy the *Widmar* test, such a determination is premature because we have before us now only the allegations contained in Sturm's complaint.[14]

### C.

Finally, we examine Sturm's contention that the directives contained in the June 16 correspondence denied her equal protection of law.[15] In essence, the plaintiff now asks us to accept a claim that we rejected when presented in due process garb. For the following reasons, we hold that the district court erred in dismissing plaintiff's equal protection claim.

Traditional equal protection analysis requires a party challenging government action to demonstrate that the applicable classification burdens one class affected by it while benefitting the other. *See Confederation of Police v. City of Chicago*, 529 F.2d 89, 93 (7th Cir.1976). Government action cannot violate the equal protection clause if it does not create classifications among, or discriminate between, those affected. *Palmer v. Thompson*, 403 U.S. 217, 219–26, 91 S.Ct. 1940, 1942–45, 29

L.Ed.2d 438 (1971). As a threshold matter, therefore, we must decide whether the directives discriminate against the plaintiff.

Importantly, we observe again that the directives affecting Sturm's visiting hours had the effect of giving her *more* access time to her clients than any other attorney at Allenwood. Plaintiff, however, alleges that the directives nonetheless "exercised a severe and substantial hardship on her." We agree. Unlike other attorneys, plaintiff was completely excluded from the prison on evenings and weekends, although she had a long distance to travel from her office to Allenwood. Conceivably, plaintiff might be prejudiced by her inability to conduct a weekend conference necessary to prepare for a Monday morning hearing. The twenty-four hour notice requirement portends a more obvious burden. Sturm's legal responsibilities might require that she have access to her clients on extremely short notice. We thus must conclude that the regulation constitutes a discriminatory classification.[16]

Turning to the appropriate standard of review, we reject Sturm's contention that the practice of law is a fundamental right within the meaning of the equal protection clause. This court has repeatedly rejected such a claim.[17] *Edelstein v. Wilentz*, 812 F.2d 128, 132 (3d Cir.1987); *In the Matter of Roberts*, 682 F.2d 105, 108 & n. 3 (3d Cir.1982) (per curiam). We therefore agree with the district court's conclusion that the

---

14. We also note that although Allenwood has a "significant government interest" in maintaining institutional security, we cannot say that Sturm's conduct justified the application of that interest. *See* pages 1016 to 1017 *infra*. Sturm's complaint alleged that the restrictions on her speech were imposed arbitrarily. Without a demonstration that Sturm posed some threat to institutional order, the Government's interest in security cannot be used to support its restriction.

15. The Supreme Court has held that the due process clause of the fifth amendment forbids the federal government to deny equal protection of the laws. *Davis v. Passman*, 442 U.S. 228, 235, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979) (quoting *Vance v. Bradley*, 440 U.S. 93, 95 n. 1, 99 S.Ct. 939, 941 n. 1, 59 L.Ed.2d 171 (1979)). *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

16. Our conclusion implicitly assumes that a discriminatory practice need not satisfy *Davis'* "alteration or extinguishment of an existing right" standard in order to constitute an equal protection violation. Therefore, we can reject Sturm's due process challenge to the directive, yet sustain the same contention when asserted as an equal protection claim under the due process clause of the fifth amendment.

17. Plaintiff additionally claims that by impairing her fundamental right to practice law, the directives violated her ninth amendment right to privacy. Because we reject the contention that the right to practice is fundamental, plaintiff's claim is without merit. Additionally, we agree with the district court that Sturm has failed to state a claim arising under Pennsylvania tort law.

directive must be upheld if rationally related to a legitimate government interest. *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979).

There is no doubt that the Government has a legitimate interest in ensuring prison security. "Central to all other correctional goals is the institutional consideration of internal security within the corrections facilities themselves." *Bell v. Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). We cannot, however, conclude that the directives were rationally related to Allenwood's legitimate interest in security based on the allegations in Sturm's complaint. Plaintiff alleges that she has done nothing to invoke the application of Allenwood's security interest. She denies having solicited legal business in the visitation area, or having instigated the confrontation with officer Garzarelli on June 16. We have no doubt that Allenwood could, in the interest of security, impose notice and visiting hour regulations on *all* attorneys. 28 C.F.R. § 543.13(b), (c). Yet, it did not do so here. To constitutionally apply the directives to Sturm alone, Allenwood must demonstrate that her actions necessitated the application of its security interest to her. We have no doubt that the directives would rationally advance defendants' interest, if in fact Sturm threatened it. Absent such a demonstration, the directives are arbitrary, and correspondingly fail the "rational relation" test. Accordingly, in the present posture of the case, we must hold that it was error to dismiss plaintiff's equal protection claim.

Therefore, the order of the district court dismissing plaintiff's first amendment and equal protection clause claims will be reversed and the case remanded for further proceedings consistent with this opinion. In all other respects, the order of the district court will be affirmed.