**Bruce BOYLE, BDB Enterprises, LLC; BMD Associates, LLC; and Forge Landing Marina, Inc., Plaintiffs,**

v.

**Donato D'ONOFRIO, Sr.; Donato D'Onofrio, II; Commerce Bank, Paul Dalton, CPA; Mary D'Onofrio; Blue Sky Inc.; Dan–D, Inc.; D. Business Management, Inc; J & D Enterprises, Inc.; Maridan Enterprises, Inc.;** **Marsh Schiff, Inc.; Pinewald Villa, Inc.; Ocean–Monmouth Construction, Inc.; Frank Mandia; Mandia–Coast, Inc.; Mark Dalton; Lake Riveria Company, LP; John Does 1–99, and ABC Company 1–99, Defendants.**

Civil Action No. 99–5694(MLC).

United States District Court,
D. New Jersey.

May 31, 2000.

John P. Brennan, Jr., Law Office of John Brennan, Spring Lake Heights, NJ, for Plaintiffs.

Nicholas C. Harbist, David A. Dorey, Blank Rome Comisky & McCauley LLP, Cherry Hill, NJ, for D'Onofrio Defendants.

Kenneth R. Pentony, Novins, York & Pentony, PC, Toms River, NJ, for Defendant Commerce Bank.

James M. McGovern, Jr., Lomurro, Davison, Eastman & Munoz, P.A., Freehold, NJ, for Defendant Paul Dalton.

Shawn P. McCarthy, King, Kitrick, Jackson & Troncone, Brick, NJ, for Defendant Lake Riviera Co.

## MEMORANDUM OPINION

COOPER, District Judge.

The instant litigation arises from an effort by plaintiff Bruce Boyle and defendant Donato D'Onofrio to develop a marina property in Brick, New Jersey. Plaintiffs set forth claims premised on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), (d), and on various state law causes of action.

This matter comes before the Court on motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) by (1) defendants Donato D'Onofrio, Sr.; Mary D'Onofrio; Donato D'Onofrio, II; Blue Sky, Inc.; Dan–D, Inc; D. Business Management, Inc.; J & D Enterprises, Inc.; Maridan Enterprises, Inc.; Morris Schiff; Pinewald Villa, Inc.; and Ocean–Monmouth Construction, Inc. (the "D'Onofrio defendants"); (2) Commerce Bank, NA ("Commerce Bank"); (3) Paul Dalton ("Dalton"); and (4) Lake Riviera Company. Defendants Donato D'Onofrio, Sr. and Donato D'Onofrio, II have also filed a motion to lift the *lis pendens* filed by plaintiffs on the property owned by the plaintiff entities. For the reasons stated, each motion to dismiss is granted as to plaintiffs' claims premised on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The Court declines to assert supplemental jurisdiction over plaintiffs' remaining state claims. The Court will also grant the motion to lift the *lis pendens*.

---

1. Plaintiffs originally filed a 76–page Complaint, which the Court dismissed for failure to satisfy the requirements of Federal Rule of Civil Procedure 8(a)(2). (Order dated 12–21–

## BACKGROUND

The Court will set forth in a condensed form the allegations contained in plaintiffs' 45–page First Amended Complaint.[1] Plaintiff Bruce Boyle ("Boyle") and defendant Donato D'Onofrio, Sr. ("D'Onofrio") joined together in 1994 to develop a marina property known as the Forge Landing Marina ("marina") in Brick, New Jersey. (First Am. Compl. "Preliminary Statement"; ¶¶ 25, 28–30.)

Boyle is a contractor and sought an investor to provide financing for the acquisition and financing of the marina. (*Id.* ¶¶ 26, 30.) D'Onofrio agreed to loan $125,000 to the project and to obtain a permanent financing commitment within 150 days of the signing of an agreement between Boyle and D'Onofrio. (*Id.* ¶ 36.) D'Onofrio allegedly stated that he was a member of the Board of Trustees of Commerce Bank and would consequently be able to obtain additional financing. (*Id.* ¶ 33.) Plaintiffs allege that D'Onofrio claimed that Commerce Bank insisted that D'Onofrio own the controlling interest in the project before the bank would provide a loan. (*Id.* ¶ 34.)

The parties' rights and obligations were set forth in an agreement dated May 4, 1994. (*Id.* ¶ 40.) The initial closing on the marina property in May 1994 created three corporations, (*id.* ¶¶ 40, 44):(1) plaintiff Forge Landing Marina, Inc. is the operating entity for the marina, (*id.* ¶ 25); (2) plaintiff BDB Enterprises, LLC owns the 9.4 acre marina site; and (3) plaintiff BMD Associates, LLC owns a 35 acre parcel adjacent to the marina and a non-contiguous 4 acre parcel on Jordan Avenue in Brick (the "Jordan Avenue property"). (*Id.* ¶ 25.)

Plaintiffs allege that D'Onofrio tried to take over Boyle's interest in the marina pursuant to a provision in the May 4, 1994 agreement.[2] (*See* First Am. Compl. ¶ 36

---

99.) We also granted plaintiffs leave to file an amended complaint. (*Id.*)

2. The details of the provision are not set forth in the First Amended Complaint. Plaintiffs

(alleging that D'Onofrio believed that by failing to obtain financing in a prompt manner, "he could use his partnership with Commerce Bank to declare a default on the financing and thereby shut out Boyle's ownership interest."); *id.* ¶ 39 ("D'Onofrio purposely controlled the funding because he was using the original promised $125,000 and the Bank's draws for other uses in order to wipe out Boyle."); *id.* ¶ 43 ("It became immediately apparent that [D'Onofrio's] real interests involved slowing the procurement of financing and consequently the construction to ultimately squeeze Boyle out.").) There is no allegation that D'Onofrio's alleged plan succeeded.

D'Onofrio terminated Boyle as a Manager of Operations at the marina on September 15, 1995 and allegedly tried to have Boyle removed from the property. (*Id.* ¶¶ 56–57.) D'Onofrio then filed an order to show cause in state court. (*Id.* ¶ 57.) The ensuing litigation resulted in an agreement on November 12, 1995 to resolve the issue of marina operations by, *inter alia,* agreeing that the marina would be operated on a day-to-day basis by a designee agreed to by both Boyle and D'Onofrio. (*Id.* at 58.)

Plaintiffs allege that D'Onofrio never obtained permanent construction financing. (*Id.* ¶ 48.) Boyle therefore on April 20, 1995 declared D'Onofrio in default of the May 4, 1994 agreement. (*Id.* ¶ 49.) Boyle then sought to buy out D'Onofrio's interests in the marina.[3] Boyle located a private investment partnership known as Dimeling, Schreiber & Park of Philadelphia ("DS & P") that was interested in the marina. (*Id.* ¶ 60.) DS & P allegedly provided Boyle with a letter of intent to purchase D'Onofrio's interest for $850,000 contingent on entering a binding legal agreement and obtaining financial statements. (*Id.*)

Plaintiffs allege that the deal with DS & P fell through because D'Onofrio failed to provide the desired financial information. (*Id.*) Plaintiffs also allege that D'Onofrio's plan was to frustrate any attempted buy-out of his interests by, *inter alia,* (1) asking that his attorneys' fees be paid, (*id.* ¶ 69), and (2) demanding a statement from Boyle that D'Onofrio's legal and professional fees be made a liability of the enterprise if the transaction did not occur, (*id.* ¶ 74). D'Onofrio's attorneys also allegedly stated on December 5, 1996 that the deal could not proceed because D'Onofrio had just discovered the existence of tax sale certificates against the property. (*Id.* ¶ 76.) Plaintiffs allege that D'Onofrio knew of the certificates as of August 31, 1995. (*Id.*)

D'Onofrio also allegedly gave Boyle a document "which was a summary of loans and exchange accounts of moneys advanced by D'Onofrio and his associated companies to the marina project." (*Id.* ¶ 78.) Plaintiffs allege that the statement included "alleged monies paid by and/or to

---

had inserted the entire agreement in their original Complaint. (*See* Compl. ¶ 57, pp. 15–19.) The D'Onofrio defendants submitted a copy of the agreement in an appendix in support of their motion to dismiss. (*See* Defs.' App. at Da46–Da56.) The Court will not consider defendants' appendix in light of the standards governing a motion to dismiss. *See* Fed.R.Civ.P. 12(b)(6). We will, however, interpret the First Amended Complaint to allege that a contractual provision allows D'Onofrio to buy out Boyle's interest in the event of a default on the Commerce Bank loan.

**3.** It is unclear from the First Amended Complaint whether Boyle had a contractual right to buy out D'Onofrio's interests. (*See, e.g.,* First Am. Compl. ¶ 60 (stating that Boyle "determined to test D'Onofrio's sincerity about *permitting* a buy out of D'Onofrio's interest" (emphasis added)).) Plaintiffs did not cite any pertinent contractual language in the First Amended Complaint, and the Court will not consider the copy of the agreement in defendants' appendix. *See supra* note 2. We will liberally interpret the First Amended Complaint, however, to allege that a contractual provision allows Boyle to buy out D'Onofrio's interest in the marina, in the event D'Onofrio did not arrange permanent financing, for a set price along with various costs accrued by D'Onofrio.

defendants Paul Dalton, Mary D'Onofrio, Blue Sky, Inc., Dan–D, Inc., D. Business Management, Inc.; J & D Enterprises, Inc., Maridan Enterprises, Inc., Morris Schiff, Inc.; Pinewald Villa, Inc.; Frank Mandia, Mandia–Coast, Inc. & Mark Dalton." Plaintiffs state that the accounts represent D'Onofrio's self-dealing and involve a series of dubious transactions whereby D'Onofrio and the other defendants defrauded plaintiffs. (*Id.*)

Commerce Bank allegedly requested that D'Onofrio provide financial information about the marina before allowing a proposal by DS & P regarding the marina financing to proceed to the bank's loan committee. (*Id.* ¶ 90.) Plaintiffs allege that D'Onofrio transmitted to Commerce Bank in October 1997 certain financial statements that were "nonsensical, inaccurate, suspect, incomplete, inconsistent, incorrect, misleading, and fraudulent." (*Id.* ¶ 91.) The buyout by DS & P did not occur. (*Id.* ¶ 60.)

On August 24, 1998, D'Onofrio allegedly executed a sale agreement for the Jordan Avenue property to defendant Lake Riviera Company for $300,000. (*Id.* ¶ 105.) Plaintiffs allege that the price paid was lower than market value and that D'Onofrio falsely advised Boyle on April 1, 1998 that the transaction was a cash transaction. (*Id.* ¶ 99.) D'Onofrio acknowledged on April 29, 1998 that Boyle believed the property to be worth at least $550,000. (*Id.* ¶ 100.) That sale has not been consummated. (Hr'g dated 5–9–00.)

Finally, plaintiffs allege that D'Onofrio transmitted copies of "Schedule K–1 (Form 1065, Partner's Share of Income, Credits, deductions, etc)" for BMD Associates, LLC and BDB Enterprises, LLC to Boyle on August 27, 1998 and September 15, 1998 respectively, and that the forms, prepared by Dalton and D'Onofrio, were false. (First Am. Compl. ¶¶ 104–107.)

Plaintiffs set forth ten claims: (1) a civil RICO claim against all defendants premised on 18 U.S.C. § 1962(c), (d); (2) breach of the May 4, 1994 Agreement, breach of the November 12, 1995 Agreement, breach of fiduciary duty, oppressive acts against a minority shareholder/member, conversion, and fraud against defendants Donato D'Onofrio, Sr., and Donato D'Onofrio, II; (3) breach of fiduciary duties and professional responsibilities against defendant Dalton; (4) breach of bailment duties against defendant Commerce Bank; and (5) tortious interference with contracts against all defendants other than Donato D'Onofrio, Sr., and Donato D'Onofrio, II. (First Am. Compl.)

The D'Onofrio defendants filed a motion to dismiss on May 1, 2000. They argue that plaintiffs have failed to set forth valid RICO claims for the following reasons: (1) Boyle cannot allege any injury to his business or property and therefore does not have RICO standing, (D'Onofrio Defs.' Br. in Supp. at 15–17); (2) the RICO claim is time barred, (*id.* at 18–21); (3) plaintiffs do not and cannot plead a RICO enterprise, (*id.* at 23–24); and (4) plaintiffs have failed to plead a "pattern" of racketeering, (*id.* at 24–34). The D'Onofrio defendants also set forth arguments in reference to the fraud and tortious interference claims asserted by plaintiffs. (*Id.* at 36–40.) The other moving defendants all join in the arguments made by the D'Onofrio defendants.[4]

### DISCUSSION

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) will be granted when, taking the allegations in the complaint and all reasonable inferences therefrom as true, the plaintiff can prove no set of facts that would entitle him or her to relief. *See Bartholomew v. Fischl*, 782 F.2d 1148, 1152 (3d Cir.1986). Further, all reasonable inferences that can

---

4. The other moving defendants also set forth their own independent arguments. We will not address these arguments, or the arguments by the D'Onofrio defendants in regard to the non-Rico claims, in light of our dismissal of plaintiff's RICO claim and our consequent loss of subject matter jurisdiction.

be drawn from the plaintiff's allegations "must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987) (citations omitted). This Court may not dismiss a complaint unless the plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

RICO is primarily a criminal statute, but it provides treble damages for "any person injured in his business or property by reason of a violation of [RICO's criminal provisions]." *See* 18 U.S.C. § 1964(c). To state a RICO racketeering claim, a plaintiff must allege that a defendant, "employed by or associated with" an enterprise affecting interstate or foreign commerce, conducted or participated in the conduct of this enterprise's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The statute also makes it illegal to conspire to carry out such an enterprise. *See* 18 U.S.C. § 1962(d).

■ To establish a pattern of racketeering, a plaintiff must show at least two predicate acts of "racketeering activity" and that the "predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The RICO statute defines "racketeering activity" to include acts which are indictable under 18 U.S.C. § 1341, relating to mail fraud, or 18 U.S.C. § 1343, relating to wire fraud. 18 U.S.C. § 1961(1)(B).

■ In this case, plaintiffs allege a number of violations of the mail and wire fraud statutes. (First Am. Compl. ¶ 22.) To prove a violation of the mail fraud statute, a plaintiff must show that the defendant employed the United States mails in furtherance of a scheme or artifice to defraud. *See Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). The mailing itself need not be fraudulent. *Id.* An "innocent mailing" will suffice if "incident to an essential part of the scheme." *Id.* at 711, 109 S.Ct. 1443.

The overall scheme, however, "must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr*, 926 F.2d at 1415 (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir.1978)). "The words 'to defraud' in the mail fraud statute have the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (citation and internal quotation marks omitted). The same standards apply to the wire fraud statute. *See Leonard A. Feinberg, Inc. v. Central Asia Capital*, 974 F.Supp. 822, 849 (E.D.Pa.1997).

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." When the predicate acts in a RICO complaint sound in fraud, Rule 9(b) applies. *See Rose v. Bartle*, 871 F.2d 331, 356 n. 33 (3d Cir.1989). "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984). While a complaint need not set out "precise words," it should adequately describe the nature and subject of an alleged misrepresentation. *Id.* Nonetheless, courts should not focus "too narrow[ly]" on the particularity language of Rule 9(b) and

should take into account the "general simplicity and flexibility contemplated by the rules." *Id.*

With these principles in mind, the Court will begin its analysis by addressing whether plaintiffs have alleged violations of the mail or wire fraud statutes. *See Kehr*, 926 F.2d at 1413 (noting that it is often helpful for a court to begin its analysis by considering the legal sufficiency of the predicate acts alleged in the RICO claim). In particular, the Court will examine whether plaintiffs allege schemes that "involve[ ] some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr*, 926 F.2d at 1415.

Plaintiffs' First Amended Complaint alleges three overall schemes: (1) D'Onofrio with the help of defendant Commerce Bank tried to take over Boyle's interest in the marina, (First Am. Compl. ¶¶ 35–55); (2) D'Onofrio with assistance from Dalton tried to prevent Boyle from buying out D'Onofrio's interest in the marina, (*id.* ¶¶ 49, 60–108); and (3) D'Onofrio executed a sale of the Jordan Avenue property to defendant Lake Riviera Company for less than market value, (*id.* ¶ 96–105). We will examine these schemes in turn.

■ Plaintiffs allege that D'Onofrio tried to take over Boyle's interest in the marina by failing to obtain financing in a prompt manner, thereby "us[ing] his partnership with Commerce Bank to declare a default on the financing and thereby shut out Boyle's ownership interest." (First Am. Compl. ¶ 39.) This alleged, scheme, however, does not involve a fraudulent misrepresentation or omission. *Kehr*, 926 F.2d at 1415.

D'Onofrio's plan may have been wrongful but it was not fraudulent. *See, e.g., McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 792 (1st Cir. 1990) (dismissing a RICO claim on the grounds that the allegations of an illegal rebate and kickback scheme did not amount to a scheme to defraud); *Young v. West Coast Indus. Relations Ass'n*, 763 F.Supp. 64, 71 (D.Del.1991) *aff'd*, 961 F.2d 1570 (3d Cir.1992) (defendants, a group of corporations, allegedly had a scheme to defraud plaintiffs of rights under a collective bargaining agreement by proposing drastic reductions in plaintiffs' wages, engaging in bad faith bargaining, and after expiration of the contract, instituting the drastic reductions; court granted defendants' motion to dismiss plaintiffs' RICO claim predicated on a mail fraud violation because plaintiffs did not allege acts or omissions calculated to deceive); *see also Slater v. Jokelson*, No. 96–CV–672, 1997 WL 164236, at *10 (E.D.Pa. Mar. 26, 1997) (plaintiff alleged that defendants filed "fraudulent" slander action; court noted that while action may have been wrongful, it did not involve a statement reasonably calculated to deceive plaintiffs and therefore could not constitute mail fraud under RICO).

Plaintiffs' attempt to use relevant catch phrases such as "fraudulent misrepresentation" does not transform the first scheme into a violation of the mail and wire fraud statutes. For example, plaintiffs allege that D'Onofrio wrote a letter to Boyle "fraudulently misrepresenting" that D'Onofrio had obtained all funds required under the May 4, 1994 agreement. (First Am. Compl. ¶ 51.) This letter, however, does not constitute a fraudulent misrepresentation as there is no allegation that it was written to deceive Boyle; instead, Boyle alleges that he suspected that D'Onofrio wrote the letter to "lay[ ] the foundation" for an effort to dispossess Boyle of his interest in the marina. *See Schiffman v. Postmaster of Phila.*, 1997 WL 602786, at *6 n. 10 (E.D.Pa. Sept. 19, 1997) (noting that plaintiff mistakenly believed that a simple false statement was fraud cognizable under the mail fraud statute). Accordingly, we find that the allegation that D'Onofrio tried to take over Boyle's interest in the marina does not set forth a violation indictable under the mail

and wire fraud statutes sufficient to establish a RICO claim.[5]

■ D'Onofrio's alleged scheme to prevent Boyle from buying him out also does not constitute mail or wire fraud under RICO. The principal allegations are that D'Onofrio delayed providing financial information to Boyle and DS & P and continued to demand reimbursement for more and more expenses. (*See* First Am. Compl. ¶ 77 ("[D'Onofrio] led Boyle and DS & P along for over a year constantly delaying, always looking to improve his position, only to squash the deal when it came time to act")); (*id.* ¶ 75) ("This was the culmination of over a years worth of work responding to D'Onofrio's repeated delays and demands and parrying."); (*id.* at 60 ("Obtaining even the most rudimentary financials from D'Onofrio were to prove so painstaking that ultimately the deal fell through.").)

D'Onofrio's failure to provide materials in a timely manner clearly does not constitute a fraudulent misrepresentation or omission. *See Kehr*, 926 F.2d at 1417 (finding that the allegation that a defendant "unreasonably delayed" the sale of a corporation, while possibly a breach of contract, contained no deception that would bring it within the purview of the mail fraud statute). We also find that D'Onofrio's claim that he was entitled to certain reimbursements could constitute a breach of contract but does not constitute fraud. *See, e.g., Young*, 763 F.Supp. at 71 (holding that "at least some sort of deception or 'other deceptive practices' should be alleged in order to warrant the intrusion of the draconian civil RICO remedies of treble damages, forfeiture and attorneys fees in what would otherwise be an ordinary breach of contract claim").

The allegations concerning this scheme that contain the words "misrepresent" or "fraud" or "false" also do not overcome the flaw in plaintiffs' RICO claim. For example, Boyle alleges the following misrepresentations: (1) D'Onofrio falsely told Boyle that Boyle had previously stated that Boyle wanted his own accountant instead of defendant Dalton to provide the enterprise's tax returns, (First Am. Compl. ¶ 64); (2) D'Onofrio falsely suggested that Boyle possessed the relevant financial information requested by DS & P, (*id.* ¶ 66); and (3) D'Onofrio's attorneys stated that D'Onofrio had just discovered the existence of tax sale certificates against the property even though D'Onofrio had referred to the certificates the year previously. (*Id.* ¶ 76.) None of these statements, however, constitute a fraudulent misrepresentation because plaintiffs do not allege that the statements were meant to deceive Boyle. *See Schiffman*, 1997 WL 602786, at *6 n. 10 (noting that a simple false statement does not always amount to fraud cognizable under the mail fraud statute).

■ Boyle also alleges that he suggested that DS & P refinance with Commerce Bank as a means of buying out D'Onofrio and that D'Onofrio falsely represented that he was willing to consider such an offer. (First Am. Compl. ¶ 67.) Even if D'Onofrio was unwilling to consider such an offer, his intention to ignore Boyle's suggestion would not constitute fraud. *See Bernstein v. Misk*, 948 F.Supp. 228, 238 (E.D.N.Y.1997) (noting that an intention to default on an obligation cannot transform what otherwise looks like a breach of contract claim into a RICO fraud claim).

■ Boyle also alleges that D'Onofrio transmitted to Commerce Bank in October 1997 certain financial statements which

---

**5.** Our conclusion is reinforced by Boyle's allegation that D'Onofrio's plan was apparent. (*See* First Am. Compl. ¶ 43 ("It became immediately apparent that [D'Onofrio's] real interests involved slowing the procurement of financing and consequently the construction to ultimately squeeze Boyle out.").) We note, however, that even if the alleged plan had remained secret, it would still not constitute fraud because of the lack of a fraudulent misrepresentation or omission.

were "nonsensical, inaccurate, suspect, incomplete, inconsistent, incorrect, misleading, and fraudulent." (*Id.* ¶ 91.) First, we note that a "nonsensical" report is unlikely to be "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr,* 926 F.2d at 1415. In addition, the submission of the forms to codefendant Commerce Bank does not appear to be incidental to an essential part of a fraudulent scheme. *Schmuck,* 489 U.S. at 711, 109 S.Ct. 1443. Accordingly, we find that this allegation does not set forth a violation of the mail or wire fraud statutes.

The final scheme alleged by Boyle is that D'Onofrio executed a sale of the Jordan Avenue property to defendant Lake Riviera Company for less than market value. (*Id.* ¶¶ 96–105.) Boyle acknowledges that he opposed the sale from the outset. (*See* First Am. Compl. ¶¶ 96, 100.) Boyle also alleges that D'Onofrio "in an effort to extort Boyle to agree with the sale of the Jordan Avenue property" stated that D'Onofrio would only agree to the sale to DS & P after the sale of the Jordan Avenue property. (*Id.* ¶ 96.)

The Court finds that this scheme also does not establish a violation of the mail or wire fraud statutes even if D'Onofrio wrongly sold the property for too low a price. Plaintiffs again fail to allege that the scheme involves a fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension. *Kehr,* 926 F.2d at 1415. Plaintiffs do not allege that D'Onofrio misrepresented the sale price of the property. In fact, Boyle was hardly deceived as he opposed the sale from the start. *See Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 747 (3d Cir.1996) (plaintiffs did not allege fraudulent predicate acts under RICO because plaintiff knew that it was being overcharged). The fact that D'Onofrio may have falsely stated that the sale was a cash

transaction does not affect our analysis because there is no allegation that the misstatement was intended to win Boyle's approval through deception—the same communication acknowledged that Boyle objected to the sale. (First Am. Compl. ¶ 99.) Accordingly, we find that the alleged scheme fails to set forth a violation of the mail and wire fraud statutes.

Boyle also makes allegations that neither fit neatly within the three overall schemes nor state a violation of the mail or wire fraud statutes. For example, Boyle alleges that D'Onofrio engaged in self-dealing with various defendants in a series of "dubious transactions whereby D'Onofrio and the other defendants defrauded" plaintiffs. (First Am. Compl. ¶ 78.) There is no allegation, however, that these transactions constituted mail or wire fraud based on a representation or omission made with intent to deceive. *Cf. Klein v. General Nutrition Companies, Inc.,* 186 F.3d 338, 345 (3d Cir.1999) (stating that Rule 9(b) requires, at a minimum, that the plaintiff identify the speaker of allegedly fraudulent statements).

Plaintiffs also allege that D'Onofrio provided Boyle in 1998 with two false tax forms, both titled "Schedule K–1 (Form 1065, Partner's Share of Income, Credits, deductions, etc.)." (First Am. Compl. ¶¶ 104, 107.) These statements fail to plead fraud with particularity pursuant to Rule 9(b).[6] *See Smith v. Berg,* No. Civ. A. 99–2133, 1999 WL 1081065, at *5 (E.D.Pa. Dec. 1, 1999) (statement that document was fraudulent failed to plead fraud with particularity under Rule 9(b) because the allegation did not explain how the document was fraudulent). In addition, plaintiffs fail to allege how the false forms are incidental to an essential part of a fraudulent scheme. *Schmuck,* 489 U.S. at 711, 109 S.Ct. 1443.

In conclusion, the Court, after a thorough examination of the First Amended

6. We note that plaintiffs did not provide more detailed information concerning these allega-

tions in their original Complaint. (*See* Compl. ¶¶ 134, 136.)

Complaint, concludes that plaintiffs have failed to allege two acts of mail or wire fraud sufficient to constitute the predicate acts of racketeering necessary to state a RICO claim.[7] The Court will consequently grant defendants' motions to dismiss as to plaintiffs' RICO claims premised on 18 U.S.C. § 1962(c), (d). The Court lacks original jurisdiction over plaintiffs' remaining claims and will exercise our discretion to dismiss the remaining claim pursuant to 28 U.S.C. § 1367(c).[8] *See Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995) ("Where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.").

Defendants Donato D'Onofrio, Sr. and Donato D'Onofrio, II have also filed a motion to lift the *lis pendens* filed by plaintiffs on the property owned by the plaintiff entities. The *lis pendens* was based on the action filed in this Court. (Pls.' Ltr. Br. dated 5–5–00 at 2.) The Court, having dismissed plaintiffs' case, will therefore grant defendants' motion to lift the *lis pendens*. *See* N.J. Stat. Ann. § 2A:15–7(b) (if a court finds that there is not a sufficient probability of final judgment in favor of the plaintiff, the court shall order the notice of *lis pendens* discharged of record).

---

**7.** The Court declines to address the other arguments put forth by moving defendants in support of their argument that plaintiffs' RICO claims should be dismissed.

We note at this juncture that defendants Frank Mandia and Mandia–Coast, Inc. have not filed a motion to dismiss. However, we will dismiss plaintiffs' RICO claim against these defendants as well. *See Michaels v. New Jersey*, 955 F.Supp. 315, 331 (D.N.J. 1996) (dismissing claim as to nonmoving defendants because the court's ruling would apply equally to nonmoving defendants).

**8.** 28 U.S.C. § 1367(d) provides:

The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

